IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Paul Charles Morphy, | ) | C/A NO. 3:05-3489-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | **OPINION and ORDER** |
| v. | ) | |
| | ) | |
| S.C. Department of Corrections, Michael | ) | |
| Moore, Ken McKeller, and Correctional | ) | |
| Officer Callahan, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the court on the motion for summary judgment filed by Defendant

Correctional Officer Callahan (Callahan), filed January 22, 2007.  For the reasons stated below, the

motion is **denied**.[1]

This case arises from an incident which occurred while Plaintiff was incarcerated in the

South Carolina Department of Corrections.  On December 17, 2002, Plaintiff was stabbed during

an altercation between inmates at Kershaw Correctional Institution (KCI).  Plaintiff subsequently

brought suit in this court pursuant to 42 U.S.C. § 1983, alleging a violation of his Eighth

Amendment rights.  On August 15, 2006, this court dismissed Defendant S.C. Department of

Corrections from this matter with prejudice, leaving Defendants Moore, McKeller, and Callahan.

In the Motion for Summary Judgment, it is noted that Defendants Michael Moore (Moore) and Ken

McKeller (McKeller) have never been served, and should be dismissed from this action.  Plaintiff

---

[1]The first part of Callahan's Memorandum in Support of his Motion for Summary Judgment
is devoted to an analysis which presumes Callahan has only been sued in his official capacity.  This
is not correct.  *See* Complaint at 1 (Dkt. #1, filed Dec. 14, 2005).  Therefore, this portion of
Callahan's motion is denied as it is based on an incorrect assumption.

has not objected to Callahan's motion in this regard. Therefore, Defendants Moore and McKeller are hereby dismissed from this action. This leaves Callahan as the only remaining defendant.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also generally Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

In deciding a summary judgment motion, the court must look beyond the pleadings and determine whether there is a genuine need for trial. *Matsushita Electric Industrial Co., Ltd. v.*

2

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986). If the defendant carries its burden of showing there is an absence of evidence to support a claim, then the plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the plaintiff. *Anderson*, 477 U.S. at 248. An issue of fact concerns "material" facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of the plaintiff's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23. Moreover, a "mere scintilla of evidence" in support of an essential element will not forestall summary judgment. *Anderson*, 477 U.S. at 251.

The Eighth Amendment requires that prison officials "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (internal quotation marks omitted). "[G]ratuitously allowing the beating . . . of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency." *Id.* (internal quotation marks, alteration and citation omitted). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834.

To establish a claim under the Eighth Amendment, a prisoner must satisfy two elements. "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id.* (quoting *Wilson v.*

3

*Seiter*, 501 U.S. 294, 298 (1991)). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). "[T]o demonstrate such an extreme deprivation, a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." *Id*. (internal quotation marks and citation omitted).

Second, a prisoner must present evidence that prison officials had a "'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson*, 501 U.S. at 297). When an inmate challenges the conditions of his confinement under the Eighth Amendment, the requisite "state of mind is one of 'deliberate indifference' to inmate health or safety." *Id*. (quoting *Wilson*, 501 U.S. at 302-03). A prison official shows deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety." *Id*. at 844 (internal quotation marks omitted).

Plaintiff was stabbed and hospitalized as a result of this incident. Therefore, his alleged deprivation is "sufficiently serious" to survive summary judgment on the first element under *Farmer*. *See*, *e.g.*, *Odom v. South Carolina Dept. of Corrections*, 349 F.3d 765, 771 (4th Cir. 2003). Therefore, the question is whether Defendant showed deliberate indifference to Plaintiff's

4

circumstance; that is, whether Callahan was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and whether he in fact drew such an inference but disregarded it. *Farmer*, 511 U.S. at 837. In other words, this court must determine whether Callahan had actual knowledge that his actions exposed Plaintiff "to a specific risk distinct from the general risks of violence from other inmates . . . to which [Plaintiff] was always exposed, and of which [Callahan] was most certainly aware." *Rich v. Bruce*, 129 F.3d 336, 339 (4th Cir. 1997).

Taken in the light most favorable to Plaintiff, the facts are as follows: On December 17, 2002, Plaintiff was incarcerated in the South Carolina Department of Corrections, housed in the upper of two tiers of the "Magnolia East" unit of KCI, in cell 58. There were approximately 150 inmates living in this unit at the time of the stabbing. Callahan was the "unit officer" on duty at the time of the stabbing, and was the only correctional officer present in the Magnolia East unit at the time of the incident.[2] Callahan's duties in the dormitory were to "secure the inmates and make sure the inmates were not fighting [and] make sure the inmates obeyed the rules and regulations and SCDC polic[ies]." Deposition of Correctional Officer Don Callahan (hereinafter "Dft's Depo.") at 15 (Dkt. #19-3, filed Jan. 22, 2007). Regulations required Callahan to walk through the unit, at thirty

---

[2]While not contended otherwise by either party, the court notes that the log book for Magnolia East, attached as Exhibit 6 to Defendant's Memorandum in Support of Summary Judgment, indicates that "Sgt Gordon" entered the unit at 2203 (10:03 p.m.), and that he exited at "2309" (11:09 p.m.). If this is accurate, "Sgt Gordon" would also have been in Magnolia East when the stabbing occurred. However, this may be a scrivener's error, as "Sgt Gordon" is listed as one of the "Second Responders" who were purportedly called at 10:17 p.m. The court notes that there are inconsistencies in both the Magnolia East and Central Security log books which lead this court to question their reliability. For instance, it is clear that the Central Security log book has been altered for the time period covering the stabbing. *See* Dkt. # 19-6 at 5 (filed Jan. 22, 2007). Callahan provides no explanation as to this alteration. Therefore, the court does not rely on any of the information contained in these log books in making this summary judgment determination.

to forty-five minute intervals, talking with inmates and checking to make sure order was maintained.[3] Callahan did not have a firearm while he was in Magnolia East; however, he did have handcuffs and pepper spray. This pepper spray was designed to be effective from a distance of fifteen to twenty feet.

Plaintiff asserts–and Callahan does not disagree–that even though regulations did not allow cell-to-cell visitation in the Magnolia East unit, inmates were allowed to move freely in the unit until "lockdown" at 11:30 p.m.[4] On the evening in question, Plaintiff testified that at least one "gang" of inmates had been roaming Magnolia East, robbing individuals of clothing and possessions. *See* Plaintiff's Deposition (hereinafter "Pla's Depo.") at 21 (Dkt. # 19-4 filed Jan 22, 2007)[5] ("You would hear loud noises, people crashing things, people cussing, hollering, people running from inmates that were robbing them. . . . [There] was . . . chaos in the institution, in the unit.").

To avoid being embroiled in this "chaos," Plaintiff and another inmate, David Smith (Smith), had been in Plaintiff's cell watching television and playing cards since approximately 8:00 p.m. Sometime between 9:30 p.m. and approximately 10:00 p.m., a group of at least five inmates (who Plaintiff maintains were inebriated) entered Plaintiff's cell, shut the door, and demanded Plaintiff's

---

[3]The parties differ as to whether Callahan did this "walk around." Plaintiff asserts that Callahan did not walk around at all, Pla's Depo. at 28, while Callahan testified that he "was around every five minutes . . . . I was constantly walking[,]" Dft's Depo. at 20. Callahan testified that he did not see the robbery, but he does not contend the robbery did not occur.

[4]Plaintiff also testified that inmates were allowed to go from unit to unit. Pla's Depo. at 18. The parties offer no explanation of the difference between "cell-to-cell" visitation, and the fact that inmates were allowed to move freely within the unit until lockdown.

[5]Excerpts from Plaintiff's deposition were filed with this court on two separate dates. For ease of location, the court will include the docket number on each citation of Plaintiff's deposition.

6

food and possessions, or "canteen."[6]  At least two of these inmates were armed with homemade

weapons, or "shanks," and threatened to kill Plaintiff if he did not comply with their demands.[7]

When Plaintiff did not immediately comply, Plaintiff was assaulted by one of the inmates, resulting

in blood "running down" Plaintiff's face.  *See* Pla's Depo. at 28 (Dkt. #19-4).  Plaintiff maintains

that it took approximately twenty to thirty minutes for these inmates to pack Plaintiff's "canteen"

into laundry bags and pillow cases and exit the cell.[8]

Smith testified in his deposition that during the robbery, Callahan walked by the cell and

looked through the door.  *See* Deposition of David K. Smith (hereinafter "Smith Depo.") at 23 (Dkt.

# 23-2, filed Mar. 6, 2007).  Smith testified that weapons were in plain sight, and there was

> canteen laying in the middle of the floor. . . .  I looked up and see [sic] Mr. Callahan
> look through the door. . . .  He looked in the room, and I looked him dead in the eyes,
> and it's kind of like, you know, . . . there's too many people in the room, you've got
> canteen laying in the floor, you've got knives in plain view.  It doesn't take a rocket
> scientist to figure out what's going on here.

Smith Depo. at 23.  Smith then testified that Callahan "walked off.  He just kept going.  He just kept

on going."  Smith Depo. at 23.  Smith testified that he did not know if Plaintiff saw Callahan at this

time.

------

[6]At least one of these robbers appears to have been a roommate of Smith.  Smith testified in his deposition that "[w]hen [Plaintiff] stood up I stood up and got in between them because I, you know, I said I see this is getting out of control quickly.  I try to – now *both of these are my roommates too at the same time*."  Smith Depo. at 22 (emphasis added).

[7]Plaintiff's roommate was not in the cell at the time.  Plaintiff does not contend that his roommate was involved in any way in this incident.

[8]Plaintiff's testimony varies as to how long the armed inmates were in his cell, ranging from either twelve to fifteen minutes (Pla's Depo. at 25 (Dkt. #23)), or twenty to thirty minutes (Pla's Depo. at 22 (Dkt. # 19-4)).

7

Plaintiff testified that after the robbers left the cell, the inmates still had "shanks" in hand, that they walked down the steps from the upper tier, and "walk[ed] in front of the officer's desk . . . straight in front of the officer's desk." Pla's Depo. at 26 (Dkt. # 23). Plaintiff and Smith proceeded to the unit officer's desk, situated on the lower level of Magnolia East, where they found Callahan. Plaintiff testified that "[a]fter they left the cell I did what policy says, is to report any incidents to the officers." Pla's Depo. at 26 (Dkt. # 23). Plaintiff testified that when he reported the incident to Callahan, Callahan laughed. Pla's Depo. at 29 (Dkt. # 19-4). Plaintiff testified:

> I tell Officer Callahan that I have just been robbed, and he sees the inmates with the knives, and has reported that he saw the inmates with the knives walking in front of his officer's desk. I told Callahan that he needed to call a response, that I had just been robbed. . . . He smiles, and says, "I don't see anything wrong with what's going on around here."

Pla's Depo. at 28 (Dkt. # 19-4). Smith testified that Callahan "looked at me like he's stunned. . . . He says nothing does nothing, just stands there." Smith Depo. at 26.

Plaintiff contends that several inmates armed with "shanks" were in the area at the time, circling him. Plaintiff asserts that for a period of eight to ten minutes, he and other inmates repeatedly requested that Callahan call for assistance.[9] Subsequently, while standing at or near the Callahan's desk, Plaintiff was stabbed.[10] Smith was also repeatedly stabbed at the same time by at least one inmate. Plaintiff fled and ran into an empty cell on the lower level, where he closed the

---

[9]Plaintiff testified that Callahan left the unit at some point during the incident. It is not clear to this court from the testimony provided, however, whether (if this is true) Callahan left the unit prior to Plaintiff being stabbed, or after. *See* Pla's Depo at 30-31 (Dkt. # 23).

[10]The parties differ as to whether Plaintiff was stabbed once by one inmate (which is what Callahan claims), or whether he was stabbed several times by different inmates. Plaintiff has not submitted any copies of medical records which would show the nature and extent of his injuries. However, there is no dispute that Plaintiff was stabbed at least once, and that as a result, he was transported by ambulance to the hospital.

cell door.  Plaintiff asserts that he emerged from this cell approximately three minutes later, and he encountered "Lieutenant Hickman."  Plaintiff testified that he then left the dormitory under his own power and was transported to Springs Memorial Hospital via ambulance.

Not surprisingly, Callahan's version of the facts differs significantly.  Callahan offers no evidence to counter Plaintiff's contention regarding the chaos of the unit that evening, but he maintains that he was "constantly walking" in the unit, and did not witness the robbery.  At approximately 10:15 p.m., Callahan was seated at the guard's station "doing paperwork" when he saw Plaintiff "coming down the steps, yelling across the [unit].  I didn't know who he was yelling at. . . .  I told him to shut his mouth and go back to his room.  He persisted in coming down the steps.  And these guys came running out of the room.  I [saw] a bunch of shanks. . . .  I called [for assistance] on the phone.[11]  And then I went over in the middle of it."  Dft's Depo. at 30.

Callahan contends that Plaintiff was stabbed once by a two-foot long "ice pick shank," and that he saw the shank "coming out of his back."  Dft's Depo. at 30.  Callahan testified that Plaintiff ran, and that he (Callahan) "went to get him.  And I brought him back up against the wall and got his ass out the door.[12]  And when I was coming back with him, . . . I saw the other guy being stabbed.

----

[11]Callahan testified that he first attempted to call on his radio, but that the radio did not work, so he immediately used the telephone.

[12]In Callahan's statement dated January 7, 2003, Callahan stated:

then I/M [inmate] Morphy came running up to me . . . [and] said [g]et me out of here.  I . . . grabbed [him] by [the] right arm and led him to [the] door unlocked the door and pushed [him] out the door to Sgt Gordon [and] Sgt Robertson.  I . . . said get Morphy to medical.

Dkt. #19-5, filed Jan. 22, 2007.

So I shoved [Plaintiff] out the door and went back and got [Smith]." Dft's Depo. at 30. Callahan testified that the assistance he had called for did not arrive until after the stabbings were over.[13]

Callahan does not assert that Plaintiff did not request assistance from him. Therefore, the relevant issue is how much time elapsed before Callahan called for assistance.[14] Plaintiff asserts that he pleaded for help from Callahan for at least eight minutes prior to the stabbing, to no avail. Callahan contends that when he saw inmates with "shanks" he immediately called for assistance, but that this assistance arrived after Plaintiff and Smith had been stabbed.

Callahan cites *Winfield v. Bass*, 106 F.3d 525 (4th Cir. 1997), for the proposition that he, being unarmed, was not required to intervene in a sudden altercation of which he had no prior notice, between armed inmates, as "such heroic measures are not constitutionally required." *Winfield*, 106 F.3d at 532. The court agrees that this is the standard in the Fourth Circuit when an unarmed prison official is confronted by a sudden, violent circumstance of which he has no prior specific knowledge. However, in this circumstance, Plaintiff's Eighth Amendment claim arose not during the actual stabbing, but rather when Plaintiff claims to have notified Callahan of the robbery and when he allegedly requested assistance from Callahan. It is highly unlikely that a prison official, confronted with an inmate with blood on his face, who was reporting an armed robbery, and who also saw

---

[13]Plaintiff testified that

[i]f an officer was down or something they'll [other officers] be there on a response in one or two minutes. Sometimes 30 seconds they'll have the response team [arrive]. But it didn't happen here, and most of the time at Kershaw if it wasn't called "Officer down, first response[,]" lots of times response would show up, lots of times response wouldn't [arrive].

Pla's Depo. at 31-32 (Dkt. # 23).

[14]Plaintiff offers no evidence that Callahan did not call for assistance at some point.

inmates with shanks, would not have drawn the inference that a specific threat existed to Plaintiff's health and safety.  Having drawn the inference, it would be unreasonable not to call for assistance as soon as possible.  If Plaintiff's version of the facts is true, Callahan's failure to protect Plaintiff was "so egregious as to bring this case within the rare category of meritorious Eighth Amendment claims by prisoners."  *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002).

However, this does not end the inquiry.  Callahan has moved for summary judgment based upon qualified immunity.  The Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), held that "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Id*. at 818.  Thus, determining whether an official is entitled to qualified immunity requires that the court make a two-step inquiry "in proper sequence."  *Parrish v. Cleveland*, 372 F.3d 294, 301-02 (4th Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)).  As a threshold matter, the court must determine whether, taken in the light most favorable to Plaintiff, the facts alleged show that the official's conduct violated a constitutional right.  *Id*.  If the facts, so viewed, do not establish a violation of a constitutional right, the inquiry ends, and Plaintiff cannot prevail.  *Id*.  If the facts do establish such a violation, however, the next step is to determine whether the right violated was clearly established at the time of the alleged offense.  *Id*.  In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition."  *Id*.  "If the right was not clearly established in the 'specific context of the case'–that is, if it was not 'clear to a reasonable officer' that the conduct in which he allegedly

engaged 'was unlawful in the situation he confronted'–then the law affords immunity from suit." *Id*. (quoting *Saucier*, 533 U.S. at 201).

If the material facts were undisputed, this court would apply *Farmer*, which was clearly established law at the time of this incident, to determine whether Callahan is entitled to qualified immunity. However, "while the purely legal question of whether the constitutional right at issue was clearly established 'is always capable of decision at the summary judgment stage,' a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial.'" *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (quoting *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992)).

Because a factual dispute remains as to whether Callahan responded reasonably when he knew that Plaintiff was in danger, this court must **deny** Correctional Officer Callahan's motion for summary judgment on grounds of qualified immunity.

Defendants Moore and McKeller are dismissed from this action. This matter shall be set for jury selection on May 10, 2007. The Clerk shall issue a trial roster notice for this case.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON McGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
March 22, 2007

C:\temp\notesB0AA3C\05-3489 Morphy v. SCDC e denying m sumjgm.wpd

12